# EXHIBIT A

**AGREEMENT OF SALE**

**BETWEEN**

**TASAL LLC,**
**a Florida limited liability company**,
***as Seller***

**and**

**ROSA NEGRA PROPERTIES, LLC,**
**a Florida limited liability company**
***as Purchaser***

**Dated: December 23, 2022**

**125 Northwest South River Drive, Miami, Florida 33125**
**129 Northwest South River Drive, Miami, Florida 33125**
**131 Northwest South River Drive, Miami, Florida 33125**

## INDEX TO AGREEMENT OF SALE


| | | Page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Subject of Sale. | 2 |
| 3. | Purchase Price. | 2 |
| 4. | Reserved | .. |
| 5. | “As-Is” | 3 |
| 6. | Representations. | 4 |
| | 6.1 Seller's Representations | 4 |
| | 6.2 Knowledge | 5 |
| | 6.3 Liability for Misrepresentations. | 5 |
| | 6.4 Purchaser’s Representations | 6 |
| 7. | Ongoing Operations | 8 |
| | 7.1 Leasing Practice. | 8 |
| | 7.2 Employees | 8 |
| | 7.3 Development Rights | 8 |
| | 7.4 Service Contracts | 8 |
| 8. | Reserved. | 8 |
| 9. | Closing. | 8 |
| | 9.1 Closing Date and Location | 8 |
| | 9.2 Closing Expenses | 9 |
| | 9.3 Closing Deliveries. | 9 |
| | 9.4 Apportionments and Expenses | 14 |
| 10. | Default. | 10 |
| | 10.1 Purchaser’s Default | 12 |
| | 10.2 Seller's Default | 12 |
| 11. | Risk of Loss. | 12 |
| | 11.1 Condemnation. | 12 |
| 12. | Purchaser's Review Period. | 13 |
| 13. | Miscellaneous. | 13 |
| | 13.1 Broker | 13 |
| | 13.2 Assignment of this Agreement | 13 |
| | 13.3 Attorneys’ Fees | 13 |
| | 13.4 Notices | 14 |
| | 13.5 Further Assurances | 15 |
| | 13.6 Confidentiality. | 15 |
| | 13.7 Survival and Merger | 16 |
| | 13.8 Recording | 16 |
| | 13.9 Successors and Assigns | 16 |

13.10 Entire Agreement ..... 16
13.11 Waiver and Modifications ..... 16
13.12 Captions and Titles ..... 16
13.13 Construction ..... 24
13.14 Non-Business Days ..... 24
13.15 Governing Law and Jurisdiction ..... 24
13.16 Counterparts ..... 16
13.17 No Third Party Benefits ..... 17
13.18 Submission not an Offer ..... 17
13.19 Severability ..... 17
13.20 Reserved ..... 17
13.21 LEAD PAINT DISCLOSURE ..... 25
13.22 Bulk Sale Compliance ..... 25
13.23 No Financing Contingency ..... 26

Schedule "A" - Description of Property
Schedule "B" - Pending Litigation
Schedule "C" - Contracts
Schedule "D" - Service Contracts
Schedule "E" - Permitted Exceptions

Exhibit 1 Form of Deed
Exhibit 2 Form of Assignment and Assumption of Contracts, Service Contracts, Permits and Approvals and Development Documents
Exhibit 3 Form of Bill of Sale

**THIS AGREEMENT OF SALE** (this "Agreement") is made this 23rd day of December, 2022, by and between TASAL LLC, a Florida limited liability company, having an address at c/o KAR Properties, 232 Madison Avenue, 2nd Floor, New York, New York 10016 ("Seller"), and ROSA NEGRA PROPERTIES, LLC, a Florida limited liability company, having an address at 255 Alhambra Circle, Suite 500, Coral Gables, FL 33134 ("Purchaser").

**W I T N E S S E T H :**

**WHEREAS,** upon the terms and conditions hereinafter set forth, Seller agrees to sell and convey fee title to that certain parcel of land described on Schedule "A" annexed hereto with the improvements erected thereon including, without limitation, the sales gallery (which parcel of land and the improvements erected thereon are herein referred to collectively as the "Property") to Purchaser and Purchaser agrees to purchase the Property.

**NOW, THEREFORE,** intending to be legally bound hereby, the parties agree as follows:

1. *Definitions.* The terms defined in this Article shall for all purposes of this Agreement have the meanings herein specified unless the context requires otherwise.

1.1 "Agreement" shall have the meaning ascribed to it in the introductory paragraph.

1.2 "Business Day" shall mean any day other than a Saturday, Sunday or day on which the banks in New York or Florida are authorized or permitted to be closed.

1.3 "Closing" shall have the meaning ascribed to it in Section 9.1.

1.4 "Closing Date" shall have the meaning ascribed to it in Section 9.1.

1.5 "Deposit" shall have the meaning ascribed to it in Section 3.1.

1.6 "Escrowee" shall have the meaning ascribed to it in Section 3.3.

1.7 "Evaluation Material" shall have the meaning ascribed to it in Section 13.6.

1.8 "Leases" shall mean any leases for all or any portion of the Property.

1.9 "Maximum Representation Expense" shall have the meaning ascribed to it in Section 6.4(b).

1.10 "Party" or "Parties" means Purchaser and Seller.

1.11 "Premises" shall have the meaning ascribed it in Section 2.2.

1.12 "Property" shall mean the land and improvements described on Schedule "A" attached hereto.

1.13 "Proration Date" shall have the meaning ascribed to it in Section 9.4(a)(i) below.

1.14 "Purchase Price" shall have the meaning ascribed to it in Section 3.

1.15 "Purchaser" shall have the meaning ascribed to it in the introductory paragraph.

1.16 "Related Parties" shall have the meaning ascribed to it in Section 13.6(b).

1.17 "Released Parties" shall have the meaning ascribed to it in Section 5.2.

1.18 "Seller" shall have the meaning ascribed to it in the introductory paragraph.

1.19 "Violations" shall have the meaning ascribed to it in Section 5.1.

2. *Subject of Sale.*

2.1 Seller agrees to sell and convey to Purchaser the Premises and Purchaser agrees to purchase from Seller the Premises subject to the terms and conditions contained in this Agreement.

2.2 This sale includes all right, title and interest, if any, of Seller in and to: (a) the Property; (b) any land lying in the bed of any street, road or avenue opened or proposed, adjacent to the Property, to the center line thereof, and all right, title and interest of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Property by reason of change of grade of any street; (c) fixtures, equipment and other personal property attached to or beneath the Property (including without limitation underground or above ground storage tanks, if any) and not owned by any tenant, property manager, or a governmental entity, if any (collectively the "Personal Property"); (d) rights of way, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Property and used in connection therewith; (e) the interest of the landlord under the Leases affecting such Property; and (f) any and all construction and development documents associated with the development of the Property including, without limitation, the plans and specifications, approvals, permits, budgets, drawings development and construction documents including, without limitation, any architect agreements, engineer agreements and construction contracts all as listed in greater detail on Exhibit "C" attached hereto and made a part hereof (collectively, the "Contracts") ((a) through (f) herein referred to collectively as the "Premises").

3. *Purchase Price*.

The purchase price (the "Purchase Price") for the Premises is the aggregate sum of Fifteen Million Five Hundred Thousand and 00/100 Dollars ($15,500,000.00), payable by Purchaser to Seller as follows:

3.1 As of the date of the full execution of this Agreement, the sum of Five Million and 00/100 Dollars ($5,000,000.00) (the "Deposit") to be paid by electronic wire transfer of immediately available federal funds to Seller, which Deposit shall be non-refundable and shall

be deemed earned automatically by Seller as and when paid. Seller and Purchaser agree that this Agreement shall not be effective unless and until (i) both Seller and Purchaser have signed and delivered this Agreement to the other party and (ii) Purchaser has paid to Seller in full the Deposit.

3.2 Intentionally Omitted.

3.3 No later than 1:00 p.m. Eastern Time on the Closing Date, Purchaser shall deliver to Land Services USA, LLC, 1835 Market Street, Suite 420, Philadelphia, PA 19103, Attn.: Michael G. Moyer, Esquire ("Escrowee") the balance of the Purchase Price, subject to adjustment and prorations pursuant to Section 9.4 below, by electronic wire transfer of immediately available federal funds pursuant to wiring instructions to be given by Escrowee or as Escrowee may direct to Purchaser prior to the Closing and on the Closing Date, Purchaser shall cause Escrowee to distribute such funds to Seller in accordance with this Agreement.

4. *Reserved.*

5. *"As-Is". "Where-Is".*

5.1 Purchaser acknowledges and agrees that (a) Purchaser has independently examined, inspected, and investigated to the full satisfaction of Purchaser, the physical nature and condition of the Premises including, without limitation, title to the Premises, the Warrant (as hereinafter defined) and its environmental condition, and the income, operating expenses and carrying charges affecting the Premises, (b) no Seller nor any agent, officer, employee, or representative of a Seller has made any representation whatsoever regarding the subject matter of this Agreement or any part thereof, including (without limiting the generality of the foregoing) representations as to the physical nature or environmental condition of any portion of the Premises, the existence or non-existence of petroleum, asbestos, lead paint, fungi, including mold, or other microbial contamination, hazardous substances or wastes, underground or above ground storage tanks or any other environmental hazards on, under or about the Premises, operating expenses or carrying charges affecting any of the Premises, the compliance of the Premises or the operation of any of the Premises with any laws, rules, ordinances or regulations of any applicable governmental or quasi-governmental authority or the habitability, merchantability, marketability, profitability or fitness of any of the Premises for any purpose, and (c) Purchaser, in executing, delivering and performing this Agreement, does not rely upon any statement, offering material, operating statement, historical budget, engineering structural report, any environmental reports, information, or representation to whomsoever made or given, whether to Purchaser or others, and whether directly or indirectly, orally or in writing, made by any person, firm or corporation except as expressly set forth herein, and Purchaser acknowledges that any such statement, information, offering material, operating statement, historical budget, report or representation, if any, does not represent or guarantee past or future performance of the Premises. Without limiting the foregoing, but in addition thereto, except as otherwise expressly set forth in Section 6.1 of this Agreement, Seller shall deliver, and Purchaser shall take, the Premises in its "as is" "where is" condition and with all faults on the Closing Date, including without limitation, any notes or notices or violations of law or municipal ordinances, orders or requirements imposed or issued by any governmental or quasi-governmental authority having or asserting jurisdiction, against or affecting the Premises and any conditions which may result in violations (collectively, "Violations"). The provisions of this Section shall survive the Closing or the earlier termination of this Agreement.

5.2 Except as expressly set forth in this Agreement, Purchaser hereby waives, releases and forever discharges the Seller, its affiliates, subsidiaries, officers, directors, shareholders, employees, independent contractors, partners, representatives, agents, successors and assigns (collectively, the "Released Parties"), and each of them, from any and all causes of action, claims, assessments, losses, damages (compensatory, punitive or other), liabilities, obligations, reimbursements, costs and expenses of any kind or nature, actual, contingent, present, future, known or unknown, suspected or unsuspected, including, without limitation, interest, penalties, fines, and attorneys' and experts' fees and expenses, whether caused by, arising from, or premised, in whole or in part, upon any Seller's acts or omissions, and notwithstanding that such acts or omissions are negligent or intentional, or premised in whole or in part on any theory of strict or absolute liability, which Purchaser, its successors or assigns or any subsequent purchaser of the Premises or any portion thereof may have or incur in any manner or way connected with, arising from, or related to the Premises, including without limitation (i) the environmental condition of the Premises (or any portion thereof), or (ii) actual or alleged violations of environmental laws or regulations in connection with any of the Premises and/or any property conditions. Purchaser agrees, represents and warrants that the matters released herein are not limited to matters which are known, disclosed, suspected or foreseeable, and Purchaser hereby waives any and all rights and benefits which it now has, or in the future may have, conferred upon Purchaser by virtue of the provisions of any law which would limit or detract from the foregoing general release of known and unknown claims. The provisions of this Section 5.2 shall survive the Closing or termination of this Agreement.

5.3 Except as specifically provided for in this Agreement or in the documents executed and delivered by Seller at Closing, Seller makes no representation or warranty as to the truth, accuracy or completeness of any of the Evaluation Materials, the due diligence materials, other materials, data or information supplied to Purchaser in connection with Purchaser's inspection of the Premises (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession). Other than with respect to the subject matter of express representations and warranties contained herein or in the documents executed and delivered by the Seller at Closing: (i) it is the parties' express understanding and agreement that such materials are provided only for Purchaser's convenience, and (ii) Purchaser shall rely exclusively on its own independent investigation and evaluation of every aspect of the Premises and not on any materials, information or reports supplied by Seller, including, without limitation the Evaluation Materials.

6. *Representations*.

6.1 *Seller's Representations.* Seller, with respect to itself and its respective interest in the Property, represents to Purchaser that as of the date hereof:

(a) Seller is, and at the Closing shall be, a limited liability company formed and in good standing under the laws of the State of Delaware and qualified to do business and in good standing in the State of Florida. Seller has the right, power and authority to make and perform its obligations under this Agreement without the need for governmental approval, consent or filing.

(b) The execution, delivery and performance of this Agreement in accordance with its terms, do not violate the operating agreement, the corporate articles or bylaws of Seller, or any unrecorded contract, agreement, commitment, order, judgment or decree to which Seller is a party or by which it is bound.

(c) Seller has the right, power and authority to make and perform its obligations under this Agreement.

(d) This Agreement is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(e) Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(f) There are no persons employed by Seller at the Premises in connection with the operation or maintenance of Premises whose employment will be binding upon Purchaser after the Closing.

(g) Except as set forth on Schedule "B" annexed hereto, or for matters fully covered (excluding deductibles) by one or more insurance policies, there is no litigation pending against Seller or the Premises.

(h) Seller has not received any written notice of any pending condemnation proceeding against the Premises or any portion thereof within the last six (6) months.

(i) Attached hereto as Schedule "D" is a current, complete and correct list of all service, equipment, supply, maintenance or concession contracts (together, called the "Service Contracts") affecting the Premises, copies of which have been provided to Purchaser by Seller as Evaluation Materials. To Seller's actual knowledge, the Service Contracts are in full force and effect, without any default by any party and without any right of set off, except as disclosed in writing at the time of such delivery. The existing property management agreement will be terminated by Seller at Seller's expense as of the date of Closing.

(j) A warrant has been approved and issued for the Premises as of April 7, 2017 by the City of Miami Planning Department as 17-0004 to allow for, among other things, the use of the Premises for a food service establishment ("Warrant").

6.2 *Knowledge.* The representations of Seller set forth in Section 6.1 are made to the actual knowledge of Shahab Karmely. Any reference to a Seller's "receipt" or language similar thereto of notices or other written documents shall mean the actual receipt of the same by Mr. Karmely. In no event shall Purchaser be entitled to assert any cause of action against Mr. Karmely nor shall Mr. Karmely have any personal liability whatsoever for any matter under or related to this Agreement.

6.3 *Liability for Misrepresentations*.

(a) Subject to the provisions of Section 6.3(b) below, if any representation of a Seller shall fail to be true in any material and adverse respect, Purchaser's sole remedy shall be to terminate this Agreement and receive the return of the Deposit and upon the receipt of same, this Agreement shall be null and void and of no further force or effect and, except for those provisions expressly stated to survive the termination of this Agreement, no party shall have any rights or obligations against or to the other. Seller shall have the option to rescind Purchaser's termination of this Agreement and adjourn the Closing for a period not to exceed thirty (30) days beyond the date scheduled for the Closing in order to make such representation true. If the Closing shall take place without Purchaser making an objection to an untrue representation of which Purchaser shall have knowledge, Purchaser shall be deemed to have waived all liability of Seller by reason of such untrue representation. The provisions of this Section 6.3 shall survive the Closing or termination of this Agreement.

(b) The provisions of Section 6.3(a) above to the contrary notwithstanding, if any representation(s) shall fail to be true and such representation(s) can be made true by the payment of a liquidated sum of money only, and if both (a) such representation(s) can reasonably be expected to be made true within a period of thirty (30) days beyond the date scheduled for Closing and (b) the sum of money required to make such representation(s) true shall not exceed Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) in the aggregate with respect to all representations and covenants that survive Closing (the "Maximum Representation Expense"), in such event, Seller agrees to adjourn the Closing for the period required to make such representation(s) true, but not to exceed thirty (30) days beyond the date scheduled for the Closing and to expend (or, at Seller's election, to obligate themselves to expend by indemnity agreement, bond or any other manner) an amount not to exceed the Maximum Representation Expense. If there shall be any untrue representation(s) which can be made true by the payment of a sum of money only which exceeds the Maximum Representation Expense, or which can be made true by the payment of not more than the Maximum Representation Expense but not within said thirty (30) day period, and Seller notifies Purchaser that Seller elects not to, or cannot, make such representation(s) true in any such extended timeframe or with the payment of an amount exceeding the Maximum Representation Expenses, Purchaser may elect to (i) cancel this Agreement by notice to Seller given within five (5) Business Days after receipt of Seller's notice or (ii) close without a credit against the Purchase Price. If Purchaser fails to timely cancel this Agreement as provided in the preceding sentence, Purchaser shall nevertheless proceed to Closing and the Purchase Price shall be reduced by the lesser of the sum of money required to make such representations true or the Maximum Representation Expense. Anything in this Section to the contrary notwithstanding, an attempt by Seller to make any untrue representation to be true shall not be deemed to be or create an obligation of Seller to make the same true.

6.4 *Purchaser's Representations*. Purchaser represents that:

(a) The execution, delivery and performance of this Agreement in accordance with its terms, do not violate the partnership agreement, corporate charter, by-laws, certificate of incorporation or operating agreement of Purchaser, or any contract, agreement, commitment, order, judgment or decree to which Purchaser is a party or by which it is bound;

(b) Purchaser has the right, power and authority to make and perform its obligations under this Agreement;

(c) Purchaser is a limited liability company in good standing under the laws of the State of Florida;

(d) This Agreement is a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms. Purchaser covenants and warrants that the representations in the preceding sentences of this Section 6.5 will be true on the Closing with respect to Purchaser or any permitted assignee of Purchaser and Purchaser or such assignee shall deliver to Seller at Closing copies of Purchaser's organizational documents and resolutions and/or consents and certificates as necessary to substantiate that such representations of Purchaser are true as of the Closing; and

(e) **PURCHASER HAS REVIEWED THE U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") WEBSITE AT: HTTP://WWW.TREAS.GOV/OFFICES/ENFORCEMENT/OFAC/ BEFORE MAKING THE FOLLOWING REPRESENTATIONS AND COVENANTS** and that the following statements are true and correct on the date hereof and will be true and correct at all times through and including the Closing Date:

(i) Purchaser understands and agrees that Seller prohibits the receipt of funds from any persons or entities that are acting, directly or indirectly, (A) in contravention of any U.S. or international laws and regulations, including anti-money laundering regulations or conventions, (B) on behalf of terrorists or terrorist organizations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC, as such list may be amended from time to time, (C) for a "senior foreign political figure", any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure, unless the Seller, after being specifically notified by the Purchaser in writing that it, or any beneficial or indirect owner of the Purchaser, is such a person, and determines in its sole discretion that such receipt of funds shall be permitted, or (D) for a foreign shell bank (such persons or entities in (A) - (D) are collectively referred to as "Prohibited Persons"). Senior foreign political figure shall have the meaning set forth in 31 CFR 103.175(r). "Foreign shell bank" and a "regulated affiliate" thereof shall have the meaning set forth in 31 CFR 103.175(j) and 31 CFR 103.175(p), respectively.

(ii) Purchaser represents, warrants and covenants that: (A) it is not, nor is any person or entity controlling, controlled by or under common control with the Purchaser, a Prohibited Person, and (B) to the extent the Purchaser has any beneficial or indirect owners, (1) it has carried out thorough due diligence to establish the identities of such beneficial or indirect owners, (2) based on such due diligence, the Purchaser reasonably believes that no such beneficial or indirect owners are Prohibited Persons, (3) it holds the evidence of such identities and status and will maintain all such evidence for at least five years from the date of the beneficial or indirect owners' complete withdrawal from the Purchaser, and (4) it will make available such information and any additional information that the Seller may require upon request.

(iii) To the extent applicable, neither Purchaser, nor any of its general or limited partners, shareholders, members, parent or subsidiary entities: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crime which in the United States would

be a predicate crime to money laundering, or a violation of any Anti-Money Laundering Laws (as defined herein); (ii) has been assessed a civil or criminal penalty under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. As used in this Agreement, the term "Anti-Money Laundering Laws" shall mean all U.S. laws, regulations and sanctions, state and federal, criminal and civil, that (1) limit the use of, and/or seek the forfeiture of proceeds from illegal transactions; (2) limit commercial transactions with designated countries, or individuals believed to be terrorists, narcotics dealers, or otherwise engaged in activities contrary to the interests of the United States; (3) require identification and documentation of the parties with whom a Financial Institution (as defined in the relevant statute) conducts business; or (4) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations, and sanctions shall be deemed to include, without limitation, the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., as amended by the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "USA PATRIOT Act"), as amended, and the regulations promulgated thereto; as well as 18 U.S.C. Sections 1956, 1957 and 1960.

7. *Ongoing Operations*.

7.1 *Operations.* Seller shall continue to operate the Premises in the same manner and with the same practices as it has leased and operated the Premises prior to the date hereof.

7.2 *Employees.* During the pendency of this Agreement, Seller shall not hire any employees for whom Purchaser will have liability following the Closing.

7.3 *Development Rights.* During the pendency of this Agreement, Seller shall not sell, lease, transfer or otherwise encumber any development rights appurtenant to the Premises that would materially and adversely affect the Premises.

7.4 *Service Contracts*. Prior to the expiration of the Outside Termination Date, Purchaser will advise Seller in writing of which Service Contracts listed on Schedule "D" attached hereto it will assume and for which Service Contracts Purchaser requests that Seller deliver written termination at or prior to Closing, provided Seller shall have no obligation to terminate, and Purchaser shall be obligated to assume, any cable services contract or any other Service Contracts which by their terms cannot be terminated or which cannot be terminated without penalty or payment of a fee.

8. *Reserved*.

9. *Closing*.

9.1 *Closing Date and Location.* Subject to the adjournments expressly allowed elsewhere in this Agreement, the closing of transfer of title to the Premises (the "Closing") shall take place, time being of the essence, on or before February 28, 2023; provided, however, Purchaser, upon written notice to Seller on or prior to February 21, 2023, shall be permitted to extend the Closing one time only until March 28, 2023, time being of the essence. The Closing shall take place at the offices of the Escrowee or, if otherwise agreed to by Seller and Purchaser by escrow deliveries to the Escrowee (the actual date of closing is herein referred to as the "Closing Date") pursuant to reasonably acceptable escrow instructions that will provide, among other

things, that the transfer documents will be released only upon Escrowee, on behalf of Seller, being unconditionally and irrevocably authorized to disburse the Purchase Price to Seller or as Seller may direct.

9.2 *Closing Expenses.*

(a) *Seller's Expenses.* Seller shall pay (i) one-half (1/2) of any escrow or closing charge of the Escrowee, (ii) the amount of any documentary stamp tax imposed by State and County law on the deed, (iii) all professional fees and fees of other consultants incurred by Seller, and (iv) all recording fees and charges related to the recording of documents related to the release of any existing indebtedness such that there are no monetary encumbrances (except for any ongoing obligations of any recorded documents including, without limitation, the Warrant) against the Property.

(b) *Purchaser's Expenses.* Purchaser shall pay (i) one-half (1/2) of any escrow or closing charge of the Escrowee; (ii) the cost of recording the deed; (iii) all expenses relating to its inspection of the Premises including, but not limited to, engineering, environmental and property surveys; (iv) the cost for the title search and the premium for the issuance of an Owner's Title Insurance Policy (inclusive of any title endorsements); and (vi) any cost incurred in connection with any financing obtained by Purchaser including, without limitation, mortgage recording tax (i.e., Florida documentary stamp taxes and non-recurring intangible taxes), title insurance premiums and title insurance endorsements.

(c) Each party shall pay all its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including, without limiting the generality of the foregoing, (i) all costs and expenses stated herein to be borne by a party, and (ii) all of their respective accounting, legal and appraisal fees.

(d) The provisions of this Section 9.2 shall survive the Closing or earlier termination of this Agreement.

9.3 *Closing Deliveries*.

(a) At Closing (or within five (5) Business Days thereafter with respect to delivery of items other than documents executed by Seller in connection with the Closing), unless expressly stated to the contrary herein, Seller shall deliver to Purchaser or Escrowee:

(i) a Special Warranty Deed executed by of Seller and acknowledged in the form attached hereto as Exhibit 1;

(ii) an Assignment of Contracts executed by Seller in the form annexed hereto as Exhibit 2 (the "Assignment") assigning all of Seller's right, title and interest in and to all of the Contracts and Service Contracts to Purchaser;

(iii) a Bill of Sale executed by Seller in the form annexed hereto as Exhibit 3, selling, transferring and quitclaiming Seller's interest in the Personal Property, if any, to Purchaser without representation or warranty;

(iv) duly executed certificate of Seller in the applicable form set forth in Treasury Regulations §1.1445-2(b)(2);

(v) an update of Seller's representations executed by Seller in accordance with Section 6.3 above;

(vi) a title certificate for the Premises executed by Seller in the form attached hereto as Exhibit 5;

(vii) a settlement statement executed by Seller; and

(viii) such other items, instruments, and documents as may be reasonably required to consummate the transaction.

(b) At Closing Purchaser shall deliver to Seller or Escrowee:

(i) the balance of the Purchase Price as provided in Section 3 hereof;

(ii) the Assignment executed by Purchaser in the forms attached hereto as Exhibit 2 agreeing to assume all of Seller's right, title and interest in and to the Contracts and all of the Service Contracts;

(iii) evidence of Purchaser's organizational authority;

(iv) a settlement statement executed by Purchaser; and

(v) such other items, instruments, and documents as Seller may reasonably require to consummate the transaction.

9.4 *Apportionments; Expenses*.

(a) *Apportionments*. The following items shall be adjusted and apportioned between Seller and Purchaser as follows:

(i) *Rents and Income.* Rents and other income and revenue relating to the Premises and collected by Seller for the month in which Closing occurs shall be deemed earned ratably on a per diem basis and shall be prorated as of 11:59 P.M. on the day immediately preceding the Closing Date (the "Proration Date"). Amounts collected by Seller prior to the date of Closing as rent for each day occurring after the Proration Date and all other prepaid amounts shall be credited to the Purchaser at Closing. Unpaid amounts shall not be adjusted or pro-rated at Closing but instead shall be handled in accordance with the remaining provisions of this Section 9.4(a)(i). All such amounts collected by Seller from tenants or other payors after Closing shall be paid over and applied in the following order of priority: (a) first, on account of rents and other sums due to Seller and Purchaser (and pro-rated between them as of the Proration Date) for the month in which Closing occurs; (b) then, on account of rents and other sums due to Purchaser after Closing; and (c) thereafter, on account of rents and other sums due to Seller for any month prior to the month of Closing; provided, however, no further prorations or payments of

rent or revenue collected after Closing shall be made between the parties after the period which is ninety (90) days following the Closing Date (the "Post-Closing Proration Date").

(ii) *Taxes*. Real estate taxes and assessments, including penalties and interest, shall be prorated as follows: All real estate taxes affecting the Property, including any and all fees and expenses in appealing any assessment or tax bill, shall be prorated as of the Closing Date based on the actual current tax bill, but if such tax bill has not yet been received by Seller by the Closing Date then current year's taxes and assessments shall be the amount of the previous year's tax bill at the earliest discounted rate; provided, however, that for a period of up to ten (10) months after the Closing, Seller and Purchaser shall reprorate the taxes and pay any deficiency in the original proration to the other party promptly upon receipt of the actual bill for the relevant taxable period. All prorations shall not be affected by the results of any Tax Proceeding.

(iii) *Utilities.* Charges for water, electricity, sewer rental, gas, if any, and all other utilities shall be prorated on a per diem basis as of the Proration Date, disregarding any discount or penalty and on the basis of the fiscal year or billing period of the authority, utility or other person levying or charging for the same. If the consumption of any of the foregoing is measured by meters, then in lieu of apportionment as aforesaid Seller shall, not earlier than five (5) days preceding the date of Closing, obtain a reading of each such meter and Seller shall pay all charges thereunder through the date of the meter readings. If there is no such meter or if the bills for any of the foregoing have not been issued prior to the date of Closing, the charges therefor shall be adjusted at the Closing on the basis of charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued. Seller and Purchaser shall cooperate to cause the transfer of the Premises utility accounts from Seller to Purchaser. Notwithstanding the foregoing or anything contained herein to the contrary, Seller shall receive a credit for utility reimbursements from tenants which apply to utility bills paid by Seller or Property Owner or prorated to Seller hereunder, calculated using the monthly average of tenant reimbursements for the prior three (3) month period as a percentage of the corresponding utility bill(s) paid, and such amount will be credited to Seller at Closing and shall be final between Seller and Purchaser and not subject to adjustment after the Closing.

(iv) *Intentionally Omitted*.

(v) *Charges under Contracts*. The unpaid and prepaid monetary obligations of Seller with respect to any of the Service Contracts shall be prorated on a per diem basis as of the Proration Date (but expressly excluding any prepaid amounts under cable contracts or laundry leases, which amounts shall be retained by the Seller).

(b) *Expenses*. In the event that final calculations cannot be made for any expense item, prior to Closing, Seller and Purchaser shall estimate the proration at Closing and shall reprorate such items as soon as adequate information is available. Payments in connection with the final adjustments shall be made by Seller or Purchaser, as the case may be, within ten (10) days after notice; provided, however, that, except with respect to the payments of delinquent rents under Section 9.4(a)(i), no party shall be responsible for making any payments to the other party in connection with adjustments if such adjustments are not requested by such party by the Post-Closing Proration Date; provided, however, that the Post-Closing Proration Date with

respect to taxes described in Section 9.4(a)(ii) shall be December 31 of the year in which Closing occurs.

10. *Default*.

10.1 *Purchaser's Default.* If Purchaser should default under this Agreement, Seller may elect to cancel this Agreement by giving notice to Purchaser and Escrowee. The parties hereto agree that the damages that Seller will sustain as a result of such default will be substantial but will be difficult to ascertain. Accordingly, the parties agree that in the event that Seller shall elect to terminate this Agreement as a result of such default, Purchaser shall retain the Deposit as and for its liquidated damages and sole remedy hereunder, in which event this Agreement shall be null and void and of no further force or effect except for those provisions expressly stated to survive the termination of this Agreement.

10.2 *Seller's Default.* If, for any reason whatsoever Seller shall be unable to or elects in its sole discretion not to convey title to the Premises subject to, and in accordance with, the terms of this Agreement, the sole obligation of Seller (and Purchaser's sole and exclusive remedy) shall be to refund the Deposit to Purchaser and upon the making of such refund, this Agreement shall be null and void and of no further force or effect except for those provisions expressly stated to survive the termination of this Agreement and the lien, if any, of Purchaser against the Premises shall wholly cease. Purchaser hereby waives all other rights and remedies that it might have including, but not limited to, the right to sue for damages or specific performance.

11. *Risk of Loss.*

11.1 *Condemnation or Damage.* If at any time prior to the date of Closing all or any portion of the Premises is destroyed or damaged as a result of fire or any other casualty whatsoever and the cost of restoring such damage exceeds Five Million and 00/100 Dollars ($5,000,000.00), or if all or a material portion of the Premises is condemned or taken by eminent domain proceedings by any public authority or if a notice of any such prospective condemnation or taking is given by any public authority and such taking, proceeding or condemnation materially adversely interferes with the value or operation of the Premises, then, at the option of Purchaser, this Agreement shall terminate and shall be cancelled with no further liability of either party to the other, and the Deposit shall be paid to Purchaser, together with all interest earned thereon. Seller shall give Purchaser prompt written notice of any casualty or any actual or threatened taking, and Purchaser shall have ten (10) days after the date of such notice within which to notify Seller of Purchaser's election to terminate this Agreement. In the absence of such written notice, timely furnished, Purchaser's option to terminate this Agreement based upon such casualty or any actual or threatened taking no longer shall be applicable and this Agreement shall continue in full force and effect as if Purchaser's termination right were not a part hereof.

11.2 If there is any partial or total damage or destruction or condemnation or taking, as above set forth, and if Purchaser does not elect to terminate (or is not permitted to terminate) this Agreement as therein provided, then (a) all insurance and all condemnation proceeds paid or payable to Seller shall belong to Purchaser and shall be paid over and assigned to Purchaser at Closing, together with an amount equal to any deductible under Seller's insurance,

and Seller shall further execute all assignments and any other documents or other instruments as Purchaser may reasonably request or as may be necessary to transfer all interest in all such proceeds to Purchaser or to whomever Purchaser shall direct.

11.3 All existing casualty insurance policies respecting the Premises shall be maintained and kept in full force and effect by Seller pending Closing.

11.4 In the event of a dispute between Seller and Purchaser with respect to the cost of restoration under Article 11, an architect designated by Seller and an architect designated by Purchaser shall select an independent architect licensed to practice in the jurisdiction where the Premises is located who shall resolve the dispute. All fees, costs and expenses of the architect so selected shall be shared equally by Purchaser and Seller.

12. *Intentionally Omitted*.

13. *Miscellaneous*.

13.1 *Broker*. Seller and Purchaser represent to each other that no party has dealt with any broker or real estate consultant in connection with the transaction contemplated by this Agreement. Seller and Purchaser shall indemnify and hold the other free and harmless from and against any liabilities, damages, costs or expenses (including, but not limited to, reasonable attorneys' fees and disbursements) suffered by the indemnified party arising from a misrepresentation or a breach of any covenant made by the indemnifying party pursuant to this Section. The provisions of this Section shall survive the Closing or termination of this Agreement.

13.2 *Assignment of this Agreement*. This Agreement may not be assigned by Purchaser without the consent of Seller. A direct or indirect transfer, sale or assignment of the majority stock interest in a corporate purchaser or the majority membership interest in a limited liability company purchaser or the majority interest or any general partnership interest of a partnership purchaser shall constitute an assignment of this Agreement, which assignment or attempted assignment shall be void if made without the written consent of Seller. Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement, without the consent of Seller, to an affiliate, corporation, partnership or other entity in which the members of Purchaser owns and controls a greater than 50% economic and managerial interest, provided assignee assumes in writing all of the obligations of Purchaser to be performed under this Agreement in a form reasonably acceptable to Seller and an original of such fully executed assignment and assumption agreement is delivered to Seller at least five (5) Business Days prior to the Closing. No assignment of this Agreement shall relieve Purchaser from any of its obligations set forth herein arising prior to or after the effective date of the assignment. The provisions of this Section shall survive the Closing or termination of this Agreement.

13.3 *Attorneys' Fees*. If a party institutes a legal proceeding against the other party in connection with this Agreement, the losing party in such proceeding shall reimburse the prevailing party all reasonable attorneys' fees paid by the prevailing party in connection with such proceeding. The provisions of this Section shall survive the Closing or termination of this Agreement.

13.4 *Notices.* All notices hereunder to Seller or Purchaser shall be sent by certified or registered mail, return receipt requested, or may be sent by Federal Express or other overnight courier which obtains a signature upon delivery, or may be sent via facsimile, or may be delivered by hand delivery or may be delivered by electronic mail (provided that a copy of such electronic mail transmittal shall be also delivered by Federal Express or other overnight courier which obtains a signature upon delivery) in each case addressed to such party at the address of such party set forth below or at such other address as such party shall designate from time to time by notice:

| | | |
|---|---|---|
| Seller: | | c/o KAR Properties<br>232 Madison Avenue, 2nd Floor<br>New York, New York 10016<br>sk@karprop.com |
| | with a copy to: | Blank Rome LLP<br>One Logan Square<br>Philadelphia, PA 19103<br>Attention: Steven A. Shoumer<br>E-mail: steven.shoumer@blankrome.com |
| Purchaser: | | Rosa Negra Properties, LLC<br>255 Alhambra Circle, #500<br>Coral Gables, FL 33134<br>Attention: vega@corpogas.com.mx<br>E-mail: Ricardo Vega |
| | with a copy to: | Dadeland Legal Group, LLC<br>7300 N Kendall Dr., Suite 520<br>Miami, FL 33156<br>Attention: Giorgio L. Ramirez, P.A.<br>E-mail: giorgiolaw@gmail.com |

Notices shall be deemed served three (3) Business Days after mailing, and in the case of overnight courier or hand delivery on the date actually delivered to or rejected by the intended recipient, and in the case of electronic mail upon the sender’s receipt of confirmation of such electronic mail transmission provided a copy of such email is deposited with an overnight courier for next day delivery properly addressed and paid for, except for notice(s) which advise the other party of a change of address of the party sending such notice or of such party's attorney, which notice shall not be deemed served until actually received by the party to whom such notice is addressed or delivery is refused by such party. Notices on behalf of the respective parties may be given by their attorneys and such notices shall have the same effect as if in fact subscribed by the party on whose behalf it is given. Notwithstanding the foregoing provisions of this Section (a) notices served by hand delivery shall be deemed served on the date of delivery if delivered at or prior to 5:00 P.M. Eastern Time on a Business Day and on the next Business Day if delivered after 5:00 P.M. Eastern Time on a Business Day or at any time on a non-Business Day, (b) notices sent by electronic mail shall be deemed delivered on the date of transmission if the sender receives

confirmation of transmission in the manner set forth above at or prior to 5:00 P.M. Eastern Time on a Business Day and on the next Business Day if the sender receives confirmation of transmission in the manner set forth above after 5:00 P.M. Eastern Time on a Business Day or at any time on a non-Business Day, provided that a copy of such electronic mail transmittal is deposited for overnight delivery on the effective date of such transmission with Federal Express or other overnight courier which obtains a signature upon delivery.

13.5 *Further Assurances.* The parties each agree to do such other and further acts and things, and to execute and deliver such instruments and documents (not creating any obligations additional to those otherwise imposed by this Agreement), as either may reasonably request from time to time, whether at or after the Closing, in furtherance of the purposes of this Agreement. The provisions of this Section shall survive the Closing for three (3) months.

13.6 *Confidentiality.*

(a) Purchaser agrees that all written documentation furnished to Purchaser by Seller concerning any of the Premises (all of the aforementioned information is collectively referred to as "Evaluation Material"), shall be treated confidentially as hereinafter provided.

(b) Purchaser agrees to keep all Evaluation Material (other than information which is a matter of public record or is provided in other sources readily available to the public other than as a result of disclosure thereof by Purchaser or Related Parties) strictly confidential; provided, however, that the Evaluation Material may be disclosed to the directors, officers, employees and partners of Purchaser, and to Purchaser's lender, attorneys and accounting firm (all of whom are collectively referred to as "Related Parties") who need to know such information for the purpose of evaluating a possible purchase of the Premises. The Related Parties shall be informed of the confidential nature of the Evaluation Material and shall be directed in writing to keep all such information in the strictest confidence and use such information only for the purpose of evaluating a possible purchase by Purchaser. Purchaser will promptly, upon request of Seller following the termination of this Agreement, deliver to Seller all Evaluation Material furnished by Seller, whether furnished before or after the date hereof, without retaining copies thereof. Purchaser will direct Related Parties to whom Evaluation Material is made available not to make similar disclosures and any such disclosure shall be deemed made by and be the responsibility of Purchaser.

(c) Prior to the Closing, Purchaser shall keep strictly confidential and shall cause the Related Parties to keep strictly confidential the provisions of this Agreement and the transactions contemplated thereunder. After the Closing Purchaser shall not make any public disclosures and shall cause the Related Parties not to make any public disclosures mentioning Seller or regarding the provisions of this Agreement or the transactions accomplished at the Closing without the prior written consent of Seller.

(d) The provisions of this Section 13.6 shall survive the Closing or termination of this Agreement.

13.7 *Survival and Merger.* The acceptance of the Deed described in Section 9.3(a)(i) hereof by Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Agreement, except those which are herein specifically stated to survive the Closing, and Seller shall have no further liability with respect to any such agreement or obligation of Seller.

13.8 *Recording*. Purchaser shall not record this Agreement or any memorandum thereof and any such recording shall be null and void and shall constitute a default hereunder.

13.9 *Successors and Assigns.* This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns, if any, but nothing contained herein shall be deemed a waiver of the provisions of Section 13.2 hereof.

13.10 *Entire Agreement*. This Agreement and the Schedules and Exhibits annexed hereto constitute the entire agreement between the parties hereto with respect to the subject matter hereof, and all understandings and agreements heretofore or simultaneously had between the parties hereto are merged in and are contained in this Agreement and said Schedules and Exhibits.

13.11 *Waiver and Modifications.* The provisions of this Agreement may not be waived, changed, modified or discharged orally, but only by an agreement in writing signed by the party against which any waiver, change, modification or discharge is sought.

13.12 *Captions and Titles.* The captions or section titles contained in this Agreement and the Index, if any, are for convenience and reference only and shall not be deemed a part of the text of this Agreement.

13.13 *Construction.* The terms "hereof," "herein," and "hereunder," and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular article or provision, unless expressly so stated. All words or terms used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

13.14 *Non-Business Days.* If a party is required to perform an act or give a notice on a date that is a Saturday, Sunday or national holiday, the date such performance or notice is due shall be deemed to be the next Business Day.

13.15 *Governing Law and Jurisdiction.* This Agreement is to be governed and construed in accordance with the laws of the State of Florida. Purchaser and Seller hereby submit to the jurisdiction of the State and United States District courts located within Duval County, Florida in respect of any suit or other proceeding brought in connection with or arising out of this Agreement. The provisions of this subsection shall survive the Closing or earlier termination of this Agreement.

13.16 *Counterparts; Electronic Signatures.* This Agreement may be executed in two or more counterparts and each of such counterparts, for all purposes, shall be deemed to be an original but all of such counterparts together shall constitute but one and the same instrument,

binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart. Original signatures delivered by electronic mail or other electronic means shall be deemed original signatures for the purposes of this Agreement.

13.17 *No Third Party Benefits.* This Agreement is made for the sole benefit of Seller and Purchaser and their respective successors and assigns (subject to Section 13.2 above) and no other person shall have any right, remedy or legal interest of any kind by reason of this Agreement.

13.18 *Submission not an Offer.* The submission of this Agreement to any party by Seller shall not be construed as an offer, nor shall Purchaser have any rights with respect thereto, unless and until Seller shall execute a copy of this Agreement and deliver the same to Purchaser.

13.19 *Severability.* If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination will not affect the remaining provisions of this Agreement, all of which will remain in full force and effect.

13.20 *Reserved*.

13.21 *Waiver of Jury Trial.* To the fullest extent permitted by law, Seller and Purchaser each hereby waives any right to jury trial in the event any party files an action relating to this Agreement or to the transactions or obligations contemplated hereunder.

13.22 *LEAD PAINT DISCLOSURE*. EVERY PURCHASER OF ANY INTEREST IN RESIDENTIAL REAL PROPERTY ON WHICH A RESIDENTIAL DWELLING WAS BUILT PRIOR TO 1978 IS NOTIFIED THAT SUCH PROPERTY MAY PRESENT EXPOSURE TO LEAD FROM LEAD-BASED PAINT THAT MAY PLACE YOUNG CHILDREN AT RISK OF DEVELOPING LEAD POISONING. LEAD POISONING IN YOUNG CHILDREN MAY PRODUCE PERMANENT NEUROLOGICAL DAMAGE, INCLUDING LEARNING DISABILITIES, REDUCED INTELLIGENCE QUOTIENT, BEHAVIORAL PROBLEMS AND IMPAIRED MEMORY. LEAD POISONING ALSO POSES A PARTICULAR RISK TO PREGNANT WOMEN. THE SELLER OF ANY INTEREST IN RESIDENTIAL REAL PROPERTY IS REQUIRED TO PROVIDE THE PURCHASER WITH ANY INFORMATION ON LEAD-BASED PAINT HAZARDS FROM RISK ASSESSMENTS OR INSPECTIONS IN THE SELLER'S POSSESSION AND NOTIFY THE PURCHASER OF ANY KNOWN LEAD-BASED PAINT HAZARDS. A RISK ASSESSMENT OR INSPECTION FOR POSSIBLE LEAD-BASED PAINT HAZARDS IS RECOMMENDED PRIOR TO PURCHASE.

13.23 *1031 Exchange*. If so requested by either Party, the other Party will cooperate in structuring and completing this transaction for the requesting Party so as to effect a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended ("Code"). In particular, such other Party will consent to the assignment by the requesting Party prior to the closing hereunder of its right hereunder to a "qualified intermediary" or other third party for such purposes. The foregoing notwithstanding, in connection with any such exchange, neither Party shall have any obligation to acquire title to any real property nor to enter into any contract: (i) that may create or impose upon such Party any nonmonetary obligation or negative

covenant; (ii) that does not provide that the sole and exclusive remedy of any seller for a breach shall be to retain as liquidated damages the deposit paid to said seller; or (iii) requires such Party to execute any mortgage, deed of trust or similar financing instrument. It is further agreed that: (1) neither Party shall assume any responsibility for the tax consequences to any other party arising out of any exchange effected pursuant to this Paragraph; (2) the requesting Party shall reimburse the other Party for all additional costs and expenses (including reasonable attorney's fees) incurred by such other Party in connection with any such exchange; and (3) the requesting Party shall indemnify and hold the other Party harmless from and against any and all loss, cost, damage, expense or other liability (including reasonable attorney's fees) that such other Party may incur or suffer in the performance of its obligations under this Paragraph. The terms "replacement property," "qualified intermediary," and "relinquished property" as used herein shall have the meanings ascribed to them in Treasury Regulations under Code §1031.

13.24 *No Financing Contingency*. This Agreement is expressly NOT contingent upon the Purchaser's obtaining a financing commitment. Purchaser acknowledges and agrees that this Agreement is not contingent upon Purchaser's obtaining financing, and Purchaser represents and warrants that Purchaser has, or will have at the Closing, sufficient cash to complete the within transaction.

13.25 *Radon Gas*. Florida law requires that the following notice be given:

**RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.**

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement the day and year first above written.

**SELLER:**

**TASAL LLC,**
a Florida limited liability company

By: ______________________________
Name:
Title:

**PURCHASER:**

**ROSA NEGRA PROPERTIES, LLC**, a Florida limited liability company

By: ______________________________
Name:
Title:

EIN:______________________________

As to Section 4:

**LAND SERVICES USA, LLC,**
Escrowee

By: ______________________________
Name:
Title:

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement the day and year first above written.

**SELLER:**

**TASAL LLC,**
a Florida limited liability company

By: ______________________________
Name:
Title:

**PURCHASER:**

**ROSA NEGRA PROPERTIES, LLC,** a Florida limited liability company

By: ______________________________
Name: José Antonio De Anda Turati
Title:

EIN: ______________________________

As to Section 4:

**LAND SERVICES USA, LLC,**
Escrowee

By: ______________________________
Name:
Title:

SCHEDULE "A"

Legal Description of the Property

SCHEDULE "B"

Pending Litigation

None

SCHEDULE "C"

Contracts

None

# SCHEDULE "D"

## Service Contracts

None

SCHEDULE "E"

Permitted Encumbrances

[To be attached]

EXHIBIT “1”

This Instrument Prepared By:

Matthew J. Comisky, Esquire
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998

After Recording, Return to:

____________________
____________________
____________________

Tax Parcel Identification No.: _________

**SPECIAL WARRANTY DEED**

This Special Warranty Deed is made as of the _____ day of ________, A.D. 2023, between **TASAL LLC**, a Florida limited liability company (the “**Grantor**”), having an address at c/o KAR Properties, 232 Madison Avenue, 2nd Floor, New York, New York 10016 (“Grantor”), and **ROSA NEGRA PROPERTIES, LLC**, a Florida limited liability company, having an address at ____________________________________________________________ (“Grantee”).

WITNESSETH:

Grantor, for and in consideration of the sum of Fifteen Million Five Hundred Thousand and 00/100 Dollars ($15,500,000.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has granted, bargained, sold, and conveyed and by these presents does grant, bargain, sell, and convey unto Grantee that certain tract(s) or parcel(s) of land located in Miami Dade County, Florida, more particularly described in **Exhibit A** attached hereto and incorporated herein by this reference (the “Property”).

This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject only to real estate taxes for calendar year 2023 and all subsequent calendar years; and all reservations, restrictions, easements and other matters of record.

TO HAVE AND TO HOLD the Property unto Grantee, its successors and assigns in fee simple forever, and Grantor hereby binds itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, though, or under Grantor, but not otherwise.

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed as of the day and year first above written.

Signed and delivered in the presence of: GRANTOR:

**TASAL LLC**,
a Florida limited liability company

______________________________
Witness #1 Signature

By: ________________________________
Name:
Title:

______________________________
Witness #1 Printed Name

______________________________
Witness #2 Signature

______________________________
Witness #2 Printed Name

STATE OF :
:
COUNTY OF :

The foregoing instrument was acknowledged before me of [ ] physical presence or [ ] online notarization this _____ of _____, 2023, by _________________, as ____________________ of TASAL LLC, a Florida limited liability company, on behalf of and as the act and deed of said company, who

( ) is personally known to me;
( ) has produced a ______________ Driver's License as identification; or
( ) has produced a ______________ as identification.

__________________________________
Notary Signature
Print Name: __________________________
Notary Public, State and County Aforesaid
My commission expires:________________
Commission Number: __________________

(Notarial Seal)

EXHIBIT A TO DEED

[INSERT LEGAL DESCRIPTION]

EXHIBIT “2”

FORM OF ASSIGNMENT AND ASSUMPTION OF
CONTRACTS, SERIVCE CONTRACTS, PERMITS AND APPROVALS AND
DEVELOPMENT DOCUMENTS

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **TASAL LLC**, a Florida limited liability company, having an address at c/o KAR Properties, 232 Madison Avenue, 2nd Floor, New York, New York 10016 (“Assignor”), hereby assigns, transfers and delegates to **ROSA NEGRA PROPERTIES, LLC**, a Florida limited liability company (“Assignee”), and Assignee hereby accepts the assignment, transfer and delegation of, all of Assignor’s right, title and interest in and to, the construction and development documents associated with the development of the Property including, without limitation, the plans and specifications, approvals, permits, budgets, drawings development and construction documents including, without limitation, any architect agreements, engineer agreements and construction contracts (“Contracts”) set forth on Exhibit B attached hereto.

This Assignment and Assumption Agreement has been entered into pursuant to that certain Agreement of Sale dated _________, 2022, by and between Assignor and Assignee (the “Purchase Agreement”).

Assignee hereby assumes and agrees to perform, on and after the date hereof, all of the terms, covenants, obligations and conditions required to be performed by Assignor under the Contracts (collectively, the “Assignee Obligations”) entered into prior to the date hereof.

Assignee agrees to indemnify, protect, defend and hold Assignor harmless from and against any and all liabilities, losses, costs, damages and expenses (including reasonable attorneys’ fees) incurred by Assignor as a result of Assignee’s failure to perform the Assignee Obligations. Assignor agrees to indemnify, protect, defend and hold Assignee harmless from and against any and all liabilities, losses, costs, damages and expenses (including reasonable attorneys’ fees) incurred by Assignee as a result of Assignor’s breach of any obligation under the Contracts prior to the date hereof.

If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment and Assumption of Contracts, Service Contracts, Permits and Approvals and Development Documents (the “Assignment”) or concerning the meaning or interpretation of any provision contained herein, the non-prevailing party shall pay the prevailing party’s costs and expenses of such litigation, including without limitation reasonable attorneys’ fees.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

Nothing in this Assignment is intended to, or shall be construed to, confer upon or give to any person, firm or corporation other than the parties hereto any right, remedy or claim under or

by reason of this instrument.  All terms and conditions in this instrument shall be for the sole and exclusive benefit of the parties hereto.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

EXECUTED as of the ______ day of ____________________ 2023.

**ASSIGNOR**:

**TASAL LLC,**
a Florida limited liability company

By: ___________________________
Name:
Title:

**ASSIGNEE**:

**ROSA NEGRA PROPERTIES, LLC**, a Florida limited liability company

By: ______________________________
Name:______________________________
Title: ______________________________

EXHIBITS:
A - List of Contracts, Service Contracts, Permits and Approvals and Development Documents

EXHIBIT A
[TO ASSIGNMENT]
List of Contracts, Service Contracts, Permits and Approvals and Development Documents

[To Be Attached]

EXHIBIT “3”

FORM OF BILL OF SALE

NOW ALL MEN BY THESE PRESENTS, that TASAL LLC, a Florida limited liability company, having an address at c/o KAR Properties, 232 Madison Avenue, 2nd Floor, New York, New York 10016 ("Seller") in consideration of Ten and 00/100 Dollars ($10.00), the receipt and sufficiency of which is hereby acknowledged, does hereby sell, assign, transfer, quit claim and set over unto ROSA NEGRA PROPERTIES, LLC, a Florida limited liability company ("Purchaser") all, fixtures, equipment and other personal property set forth on Exhibit A attached hereto and made a part hereof (the "Personal Property") located at, on and about the real estate commonly known as 125 Northwest South River Drive, Miami, Florida 33125, 129 Northwest South River Drive, Miami, Florida 33125 and 131 Northwest South River Drive, Miami, Florida 33125, and legally described in that certain Agreement of Sale dated ____________________ by and between Seller, as seller, and [_____________________], as buyer, (the "Premises").

TO HAVE AND TO HOLD the Personal Property unto Purchaser and Purchaser's successors and assigns forever.

THE PERSONAL PROPERTY SOLD HEREUNDER IS SOLD IN "AS IS" CONDITION WITHOUT ANY REPRESENTATION OR WARRANTY BY SELLER WHATSOEVER INCLUDING, WITHOUT LIMITATION WARRANTIES OF QUALITY OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY WHICH WARRANTIES ARE EXPRESSLY EXCLUDED.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Seller has signed this Bill of Sale this _____ day of _______________, 2023.

**SELLER**:

**TASAL LLC,**
a Florida limited liability company

By: ___________________________________
Name:
Title:

Exhibit "A"
[To Bill of Sale]

The Personal Property

[To Be Attached]